UNITED STATES DISTRICT COURT
DISTRICT OF NEW JERSEY

EMILY VALLES, ADMINISTRATOR OF
THE ESTATE OF JAIME GONZALEZ,

      Plaintiff,

   v.

CUMBERLAND COUNTY, et al.,

      Defendants.

Civil Action No. 16-4757(NLH)


OPINION

APPEARANCES:

RYAN LOCKMAN, ESQ.
Mark B. Frost & Associates
1515 Market Street, Suite 1300
Philadelphia, PA 19102-1929
Attorney for the Plaintiff

ALAN G. GIEBNER, ESQ.
Buonadonna & Benson, P.C.
1138 East Chestnut Avenue, Suite 2A
Vineland, NJ 08360
Attorney for Defendants Cumberland County and Warden Robert
Balicki

Hillman, District Judge:

    Currently before the Court is the motion for summary
judgment filed by Defendants Cumberland County and Warden Robert
Balicki.  (ECF No. 50).  Plaintiff filed a response to the
motion (ECF No. 57), to which the moving Defendants replied.
(ECF No. 62).  For the following reasons, Defendants' motion
will be granted and judgment in this matter shall be entered in
favor of Defendants Cumberland County and Warden Robert Balicki.

1

## I. BACKGROUND

On August 4, 2016, Plaintiff Jaime Gonzalez[1] filed through counsel a complaint alleging that he had been subjected to excessive force while he was a pre-trial detainee at the Cumberland County Jail in 2014.  (ECF No. 1).  In that complaint, counsel presented the following factual allegations as the basis for Plaintiff's claims:

> On the date in question, August 18, 2014, Plaintiff was assigned to A-Dorm.
>
> An inmate, whose identity is unknown to Plaintiff, struck Plaintiff.  Two other inmates came to Plaintiff's aid, and began scuffling with the inmate who initially struck Plaintiff.
>
> At no time did Plaintiff himself scuffle, fight with, or strike any inmate during this incident.
>
> Without Plaintiff's knowledge, Defendant [Officer Corley] entered A-Dorm and – without saying anything – hit plaintiff in the face with gate keys he was holding.
>
> As a result, Plaintiff fell, hit his head on the gate, and then fell to the ground, hitting his head on concrete.

---

[1] Gonzalez died in late 2016 and was replaced as the formal Plaintiff in this matter by his mother, Emily Valles, acting as the administrator of Gonzalez's estate.  (*See* ECF No. 29).  As Valles acts as Plaintiff in this matter as a representative of Gonzalez and his estate, this Court uses Plaintiff throughout this opinion to refer to both Gonzalez himself in discussing the underlying facts of this matter, and to Valles in her role as administrator of Gonzalez's estate where Plaintiff is referred to as a party to this matter.

> Plaintiff suffered a concussion and thereafter
> suffered a seizure shortly after hitting the
> ground.
>
> After [the assault] by Defendant [Corley],
> Plaintiff remained on the jail cell floor
> [until] Defendant [Corley] . . . dragged
> Plaintiff out of A-Dorm by Plaintiff's leg,
> causing further damage to Plaintiff's body and
> head.
>
> . . . .
>
> Due to the severity of his injuries, Plaintiff
> was taken via helicopter from the Cumberland
> County Jail to the Cooper University Hospital
> Emergency Room, where he was treated for
> injuries caused by Defendants, including but
> not limited to a concussion, seizures, a
> fractured orbital bone, and other injuries.

(ECF No. 1 at 3-4, paragraph numbers omitted). Because the complaint was prepared by counsel, Plaintiff neither signed nor otherwise attested to the validity of the allegations contained in his pleading. (Id. at 1-14).

Based on these allegations, Plaintiff's complaint raised claims against Defendant Corley for excessive force and failure to treat his injuries, as well as two claims against the moving Defendants – a claim for municipal/supervisory liability under 42 U.S.C. § 1983 alleging that the moving Defendants, Warden Robert Balicki and Cumberland County, were responsible for the alleged excessive force used by Corley because of a policy or custom of failing to train officers or investigate uses of force which directly resulted in the alleged assault against

Plaintiff; and a virtually identical state law claim against the moving Defendants arising out of the New Jersey Civil Rights Act.[2]  (ECF No. 1 at 7-12).

Because Plaintiff died during the pendency of this matter, (see ECF No. 24), he was never deposed and therefore never provided testimony or a signed affidavit or certification laying out his version of the events underlying his complaint. Likewise, because Defendant Corley refused to participate in his defense and failed to appear for his deposition, (see, e.g., ECF No. 23), and because Plaintiff was otherwise unable to secure Corley's testimony through discovery or any related mechanism, no testimony from Corley is contained within the record, though certain documents provided by Corley as part of an internal jail investigation, discussed below, are available.  As no deposition of the other inmates involved in the scuffle which preceded Corley's arrival on the scene has been presented to this Court in relation to the motion for summary judgment, the record of this matter is utterly devoid of any direct testimony presenting any version of the events which occurred on that date from the

---

[2] Although the moving Defendants initially believed that some of Plaintiff's other claims may also have been alleged against the Warden and the County, Plaintiff clarified in the response to the summary judgment motion that his "claims against the [County] and [Warden] are only [the supervisory excessive force claim and the related NJCRA claim presented in] Counts II and V" of his complaint.  (ECF No. 57 at 5 n. 1).

individuals directly involved in the prison scuffle and
resulting intervention of Officer Corley.  Instead, the record
presents only third-party information regarding the August 18,
2014 incident.

Following the incident, Warden Balicki assigned Sergeant
Heriberto Ortiz to investigate "Inmate Jaime Gonzalez claims
that he was assaulted by Off. Jason Corley."  (Document 4
attached to ECF No. 50 at 20).  According to Sergeant Ortiz's
investigation,

> On August 18, 2014, there was a physical
> altercation [which] took place in A Dorm and
> three inmates were involved.  The inmates in
> question were Jaime Gonzalez, Pedro Andujar
> and Tremaine Davis.  Off. Corley gave the
> three inmates a verbal command to stop
> fighting and when none of them complied he
> implemented his pepper spray.  At this time
> the three inmates stopped fighting.  Medical
> was called as inmate J. Gonzalez was bleeding
> from his head and he was subsequently
> transported to the hospital.

(Id.).

In a signed witness record prepared as part of that
investigation, Officer Corley presented the following version of
the events in question:

> I heard arguing[,] when I went to investigate
> [inmate] Pedro Andujar, Jaime Gonzalez, and
> another unknown inmate began assaulting
> Tremaine Davis.  I issued verbal commands for
> them to stop which were ignored.  I then issued
> a one second burst of . . . pepper spray on
> [inmate] Andujar and handcuffed him, then
> removed him and Jaime Gonzalez from the dorm

5

> [so] they both [could] receive medical
> attention.

(Id. at 7).

In another witness record which was signed by inmate Andujar,[3] the events were summarized as follows:

> On August 18, 2014 at [approximately] 7:00 pm
> Inmate Tremaine Davis . . . who had been
> assigned to A-Dorm only hours earlier, was
> observed by several other inmates masturbating
> in the day area beside the television.
> Numerous comments were made to inmate Davis
> telling him that he needed to stop. Several
> inmates called for Officer Corley who
> responded promptly and said that he'd make a
> phone call to remove inmate Davis from the
> dorm. However only moments later inmate Davis
> proceeded to assault inmate Jaime Gonzalez by
> striking him in the face. Inmate Davis then
> turned his attention to inmate Pedro Andujar
> . . . and proceeded to strike him as well.
> Officer Corley promptly witnessed and
> [intervened] and the situation was defused.

(Id. at 8). Although Tremaine Davis also signed a witness statement on which he recorded his own version of events, that summary is utterly unhelpful and provides no useful information about the incident. (Id. at 10).

According to the reports prepared by other officers and medical staff, a code for help was called shortly after the scuffle. (Id. at 11-15). Those officers and medical staff

---

[3] Although this document was apparently attested to and purportedly signed by Andujar, the actual factual summary appears to have been written by an investigating officer based on the inclusion of inmate numbers and the style of the summary.

found inmate Andujar handcuffed and suffering from pepper spray to the eyes which was treated, and Plaintiff lying upon the floor bloody and going into seizures. (Id. at 11-15). Officers and medical staff thereafter treated and aided Plaintiff until paramedics arrived to take him to the hospital. (Id.). While the investigation report contains statements by these officers and medical staff, as well as two of the involved inmates, the report record is devoid of any statement by Plaintiff or other statement detailing his allegations of excessive force other than the statement in Sergeant Ortiz's report that Plaintiff "claim[ed]" he had been assaulted by Corley in some unspecified way.

Plaintiff's medical records add little clarity to the situation. Although Plaintiff apparently indicated that his injuries were the result of his being assaulted in the form of being "thrown into a bar at jail," the medical reports do not indicate that Plaintiff identified his attacker. (Document 3 attached to ECF No. 57 at 461-66). The records do indicate that as a result of the August 2014 incident, Plaintiff suffered "left lateral orbital wall, left maxillary sinus, and left zygomatic arch fracture[s]" around his eye, as well as a concussion. (Id. at 461-63). Doctors at the hospital also identified the seizures Plaintiff suffered before being taken to the hospital as tonic-clonic seizures. (Id. at 463). These

injuries apparently caused significant pain in Plaintiff's head, face, and neck, and caused some visual difficulties. (Id. at 461–66).

According to a certification provided by the current warden of the jail, the jail is not in possession of any report or file detailing Plaintiff's allegations of assault other than the tort claims notice filed by Plaintiff's attorney. (See id. at 453). In his certifications, the Warden further stated that between 2010 and 2017, only four officers – none of whom were Defendant Corley – were disciplined for the use of excessive force, and there have been no indictments based on use of force against officers in that time period, though two officers were under investigation by the County for instances occurring after the altercation in this matter. (See Id. at 272, 378–81, 453). Jail records indicate that there were significantly more incidents[4] in which force was used by officers in normal jail operation, but these reports do not discuss excessive force

---

[4] During the deposition of Captain Palau, Plaintiff's attorney used the index of the use of force reports provided to him during discovery that there were only a handful of incidents of force use in 2010-2013, with five times as many occurring in 2014. (see Id. at 383-86). Defendants have submitted further records indicating that this index was not an accurate measure as each entry in that index held a varying number of records – from one record of one instance of force use to numerous records covering several uses of force. (Document 2 attached to ECF No. 62 at 1-93). Thus, the record is unclear as to how many total use of force incidents occurred, or whether there was an upswing in such incidents in 2014.

specifically, but are only indicative of the use of any kind of force by officers, including perfectly valid uses of force in appropriate circumstances. (See, e.g., Document 2 attached to ECF No. 62 at 1-93; Document 3 attached to ECF No. 57 at 383-86). Jail records indicate that during the period between 2010 and the occurrence of this incident in 2014, there was only one instance in which an officer was disciplined for the use of excessive force. (Id. at 378-82).

The record of this matter also includes several policies relevant to the incident which occurred in this matter which were in force at the time of the altercation in 2014. First, the jail's use of force policy provides that where a "corrections officer uses force to control inmates, only the minimum amount of force necessary to control the situation will be authorized." (Id. at 283). The policy further provides that force may only be used by an officer in self-defense or defense of others, to prevent serious damage to property, to prevent escape, to prevent or quell a riot or disturbance, to prevent a suicide or suicide attempt, or to enforce facility regulations or "in situations where a ranking officer believes that the inmate's failure to comply constitutes and immediate threat to facility security or personal safety." (Id. at 284). Force, under the policy, shall "in no case . . . be considered justifiable as punishment or discipline." (Id.). Under the

policy, the use of pepper spray, batons, or "other weapons which are not likely to cause death or serious injury" are considered an application of non-deadly force, while the use of firearms or "[o]ther lethal weapons" are considered deadly force.  (Id. at 283).

According to Captain Palau, who was the head of the jail's training department and special investigations unit at the time of the incident at issue in this matter, and who served in those capacities for many years before and after, the jail's training policy requires officers upon recruitment to undergo both one hundred and twenty hours of training at the jail, including forty hours of on-the-job training and use of force training, as well as a course of training for ten to fourteen weeks at a corrections officer academy which generally began within a year of hiring.  (Id. at 345-48).  The jail, between 2010 and 2014, also required all officers to undergo use of force training – which included both training with firearms at a gun range as well as training as to the jail's general use of force policies and the use of mechanical and physical forms of non-deadly force – at least twice a year.  (Id. at 340).  That training was normally documented either in an individual officer's training file or as part of a separate firearms file containing information as to all officers.  (Id. at 341-42).

Where the deployment of force at the jail results in a
complaint of excessive force, the jail's investigations policy
comes into play.  Under the policy, there are three types of
complaints which are to be investigated – criminal complaints,
which are to be referred to the county prosecutor for a
determination of whether criminal charges should be filed,
administrative complaints, which include non-criminal complaints
against staff by inmates, and institutional complaints, which
include disciplinary charges.  (Id. at 280).  The policy states
that all investigations "will be authorized by the Warden before
any action is taken," and "appropriate disciplinary action shall
be taken against facility staff who engage in abusive behavior
and, when necessary, these cases will be referred" to the county
prosecutor for criminal investigation.  (Id.).  Where a criminal
complaint is made and the Warden receives notice of it, an
initial investigation is to be conducted and forwarded to the
county prosecutor, at which point either the prosecutor or the
prosecutor with help from the jail's investigators shall
investigate the criminal complaint.  (Id. at 280-81).
Administrative complaint investigations are also authorized by
the warden or his designee, and all findings are to be forwarded
with an investigation report to the warden for disposition.
(Id. at 281).  Where such an investigation is conducted, it is
to begin immediately, be "thorough in the investigation by

11

interviewing all potential witnesses, victims, and accused," all
interviews are to be documented, and all findings by the
investigator are to be submitted to the warden "noting [these]
conclusion[s] and [any] recommendations." (Id.).

During their depositions, Sergeant Ortiz, Captain Palau,
and former warden Balicki testified that the Special
Investigations Unit essentially followed[5] this policy in
conducting investigations. The three did testify, however, that
there was some irregularity in the specific investigation of
Plaintiff's complaints. Specifically, Sergeant Ortiz admitted
that he did not interview all of the witnesses or follow up on
the fact that Corley's report did not mention Plaintiff's
injuries, including Plaintiff, that his investigation report did
not reach a recommended conclusion, and his report had not been
signed by a reviewing officer or the warden. (See Document Id.
at 183-198). Captain Palau likewise testified that Ortiz's
report lacked the normal interviews, documentation, and
recommendations. (Id. at 326-30). The Captain suggested that

---

[5] All three noted that some practical variations did occur. For
example, Balicki testified that some investigations of reports
of excessive force may begin before he expressly authorized an
investigation, such as when a report is made when Balicki is
unavailable (see, e.g., Document 3 attached to ECF No. 57 at 57-
58), and that if eight people in a room of fifty all told the
same story regarding an incident further interviews may not be
conducted as they would be redundant (id. at 91), but the jail
staff generally testified that the policy represented the
general practice. (See, e.g., id. at 91-92).

the lack of a reviewing officer's signature might mean the
report was not actually completed, or was not reviewed. (Id. at
318-21). The captain testified that all these deficiencies
were, indeed, improper under the investigation policy, and
testified that this report's deficiencies were not indicative of
standard procedure. (Id. at 318-30). Warden Balicki in turn
testified that he did not recall specifically receiving
Plaintiff's complaint of excessive force, but that the Ortiz
report indicated that he had ordered one in this matter. (Id.
at 84-86). Balicki testified that he did recall reading at
least some of the report before, and that at least some
interviews, such as that of inmates Andujar and Davis had been
conducted, but that the report did not contain all the normally
required interviews and information. (Id. at 84-104).

In addition to the information regarding prison policies,
the record of this matter also includes Officer Corley's
personnel records. Although Corley's records did reveal a
history of demerits and punishments, up to and including
Corley's eventual firing by the jail, the negative reports in
Corley's personnel file were almost exclusively related to
issues with Corley's inability to keep his required schedule.
(Id. at 146-48). Specifically, Corley was repeatedly tardy,
excessively absent, and refused mandatory overtime on multiple
occasions. (Id.). Other than these attendance issues, Corley

was twice reprimanded for having his cell phone within the secure perimeter, and in August 2016, two years after the incident in this matter, was reprimanded for incompetency and violations of jail rules or policies. (Id.). Corley's record is devoid of any reprimands for use of force or excessive force. (Id.). Corley's personnel file also indicated that he had completed his initial training both in house and at the academy, although he had attendance issues at the academy, and that he attended at the very least two additional use of force training programs – once in August 2016, and once in October 2013. (Id. at 399-450).

In addition to jail staff, Plaintiff's mother was also deposed in this matter. (Document 5 attached to ECF No. 50). Plaintiff's mother testified that, while he was in the hospital, Plaintiff called her and told her he had been grabbed by an officer and was hit into the cell bars by that officer while walking through a jail hallway to his cell. (Id. at 5). She could not recall when exactly this call occurred, nor had she been told during the call if other inmates were involved, what specific officer was involved, or any other pertinent details other than the fact that her son's face had been injured. (Id. at 4-5).

In support of his claims, Plaintiff also submitted in this matter an expert report prepared by Dr. Lee Yasgur, an

ophthalmologist.[6] (Document 8 attached to ECF No. 50). In addition to a description of the wounds Plaintiff suffered following the August 2014 incident, Dr. Yasgur provides his opinion regarding the cause of Plaintiff's injuries. Dr. Yasgur opined as follows:

> within a degree of reasonable medical certainty . . . excessive blunt force trauma to the face, while the claimant was in a position to not be able to recoil, would be the cause [of Plaintiff's injuries]. Fists with large force, punching or kicking smaller featured bars, or in the corner of a floor, are well known to fracture the eye socket bones in so many places, rather than one simple floor fracture. The simpler orbital floor fractures are frequently seen from more common fighting in which faces can recoil. . . . These injuries had to be [inflicted] with the intent to maim and exert brutality.

(Id. at 4).

## II. DISCUSSION

## A. Legal Standard

Pursuant to Rule 56, a court should grant a motion for summary judgment where the record "shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P.

---

[6] Defendants have submitted a report from their own expert, an apparent expert in the biomechanics of injury, and argue that Dr. Yasgur is incapable of providing a non-net opinion in this matter. Because the Court need not address Defendants' expert or their contention as to Dr. Yasgur's qualifications to resolve this motion, the Court does not discuss Defendants' expert or these contentions further in this opinion.

56(a).  The moving party bears the initial burden of "identifying those portions of the pleadings depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, which it believes demonstrate the absence of a genuine issue of material fact." Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986).  A factual dispute is material "if it bears on an essential element of the plaintiff's claim," and is genuine if "a reasonable jury could find in favor of the non-moving party." Blunt v. Lower Merion School Dist., 767 F.3d 247, 265 (3d Cir. 2014).

In deciding a motion for summary judgment a district court must "view the underlying facts and all reasonable inferences therefrom in the light most favorable to the party opposing the motion," Id., but must not make credibility determinations or engage in any weighing of the evidence.  See Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 255 (1986).  "Where the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, [however,] there is no genuine issue for trial." Matsuhita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986).  "[W]ith respect to an issue on which the nonmoving party bears the burden of proof . . . the burden on the moving party may be discharged by 'showing' that is, pointing out to the district court – that there is an absence of

evidence to support the nonmoving party's case." <u>Celotex</u>, 477 U.S. at 325.

Once the moving party has met this initial burden, the burden shifts to the non-moving party who must provide evidence sufficient to establish that a reasonable jury could find in the non-moving party's favor to warrant the denial of a summary judgment motion. <u>Lawrence v. Nat'l Westminster Bank New Jersey</u>, 98 F.3d 61, 65 (3d Cir. 1996); <u>Serodio v. Rutgers</u>, 27 F. Supp. 3d 546, 550 (D.N.J. 2014). "A nonmoving party has created a genuine issue of material fact if it has provided sufficient evidence to allow a jury to find in its favor at trial." <u>Serodio</u>, 27 F. Supp. 3d at 550.

The party opposing the motion for summary judgment therefore cannot rest on the allegations and statements contained in its complaint, instead it must present actual, admissible evidence that creates a genuine issue as to a material fact for trial. <u>Id.</u>; <u>see</u> <u>also</u> <u>Anderson</u>, 477 U.S. at 248 (nonmoving party may not rely on its complaint to defeat a summary judgment motion, but instead must provide "significant probative evidence" which supported the complaints allegations to survive summary judgment); <u>Schoch v. First Fid. Bancorporation</u>, 912 F.2d 654, 657 (3d Cir. 1990) ("unsupported allegations in . . . memorand[a] [produced to oppose summary

judgment] and pleadings are insufficient to repel summary judgment").

**B.  Analysis**

Defendants argue that they are entitled to summary judgment in this matter for two reasons – Plaintiff has, through discovery, produced insufficient evidence to make out his underlying claim that he was the subject of an assault by Officer Corley, and second because Plaintiff has in any event failed to provide any evidence or testimony tending to show that the policies or customs put in place by the jail and Defendant Balicki caused any such assault if it did occur.  Defendants argue that these deficiencies entitle them to judgment as to both of Plaintiff's claims against them – those related to excessive force under both 42 U.S.C. § 1983 and its state law counterpart, the New Jersey Civil Rights Act (NJCRA), N.J. Stat. Ann. § 10:6-29(c).

The NJCRA has repeatedly been construed as analogous to § 1983, and NJCRA claims are therefore analyzed under the legal framework applicable to § 1983 claims absent clear state law indicating a particular claim is to be analyzed distinctly from § 1983.  See Trafton v. City of Woodbury, 799 F. Supp. 2d 417, 443-44 (D.N.J. 2011).  As the parties argue as to both § 1983 and the NJCRA claims raised in this matter by reference solely to federal law applicable to § 1983, as neither party has

provided any caselaw suggesting that the excessive force claims of pre-trial detainees are to be construed differently under the NJCRA than under § 1983, and as this Court is aware of no such cases distinguishing the two statutes in this context, the Court discusses both sets of claims together under the rubric of § 1983.  Id.

In order to make out any of his claims, supervisory or otherwise, Plaintiff must initially prove that Defendant Corley used excessive force against him.  Because Plaintiff was a pre-trial detainee at the time of the alleged assault in this matter, his claim arises out of the Fourteenth Amendment, which prohibits the imposition of punishment upon those who have not been convicted of a crime.  See, e.g., Kingsley v. Hendrickson, --- U.S. ---, 135 S. Ct. 2466, 2470-72 (2015); Bell v. Wolfish, 441 U.S. 520, 535-39 (1979).  To succeed on such a claim, the plaintiff must show that the jail-official defendant used force against him; and that "the force purposely or knowingly[7] used against him was objectively unreasonable" under the individual

---

[7] The Supreme Court has assumed, but not decided affirmatively, that a reckless use of force could support an excessive force claim, but has expressly rejected negligence as a sufficiently culpable state of mind. *Kingsley*, 135 S. Ct. at 2472.  The subjective state of mind requirement in any event applies only to the question of the state of mind in regards to the choice to use force – once such a choice is made knowingly, purposely, or possibly recklessly, the subjective intent of the officer is immaterial to the question of whether the use of force was objectively reasonable.  *Id.* at 2472-75.

facts and circumstances resulting in the use of force.
Kingsley, 135 S. Ct. at 2473. Thus, in order to make out his
claim, Plaintiff must, at the very least, supply some evidence
to support the claim that Officer Corley assaulted him. It is
with this requirement, that Defendants first take issue with
Plaintiff's proofs.

Defendants argue that Plaintiff can supply no admissible
proof to support the allegation that Defendant Corley attacked
him as the only support for that allegation comes from
Plaintiff's complaint in this matter, buttressed by the proposed
expert testimony of Dr. Yasgur, and hearsay statements such as
those made in Sergeant Ortiz's report. As Defendants correctly
point out, Plaintiff cannot successfully oppose summary judgment
by merely pointing to the allegations in his complaint –
allegations are not evidence. See, e.g., Anderson, 477 U.S. at
248; Serodio, 27 F. Supp. 3d at 550. Although the Court must
consider the pleadings in deciding a summary judgment motion, a
party's case will not survive summary judgment where the facts
he proposes cannot be "presented in a form that would be
admissible in evidence." Fed. R. Civ. P. 56(c)(2). As the
complaint is not a form of admissible evidence, it cannot be
used to establish a factual dispute. Anderson, 477 U.S. at 248;
Serodio, 27 F. Supp. 3d at 550. Plaintiff must look elsewhere
if he wishes to support his claim.

In addition to his complaint, Plaintiff points to the expert testimony of Dr. Yasgur to establish a disputed point of fact. Plaintiff argues that Dr. Yasgur's proposed testimony should be read to indicate that something other than a prison scuffle such as that which took place prior to Officer Corley's arrival on the scene in this case caused Plaintiff's injuries. At heart, though, Dr. Yasgur's report says nothing regarding *who* caused Plaintiff's injuries, or, ultimately, even how the injuries were caused. Even assuming Dr. Yasgur's opinion would be admissible at trial, the report ultimately provides only that the injuries Plaintiff suffered were caused by "excessive blunt force trauma to the face, while [Plaintiff] was in a position to not be able to recoil," which could have come from "[f]ists with large force, punching or kicking." (Document 8 attached to ECF No. 50 at 4). Although Dr. Yasgur suggests that a normal fistfight occurring where recoil was possible was less likely to result in the sort of injury Plaintiff received, and opines that Plaintiff's injuries are "consistent" with the allegations in the complaint,[8] nothing in Dr. Yasgur's report in any way answers

_____

[8] Despite this statement by Dr. Yasgur, that does not entirely appear to be the case. Dr. Yasgur believes these injuries were not the result of a "one on one fight" or "simpl[e] . . . punch" but instead the result of Plaintiff having his "face . . . held immobile" while he was punched, kicked, or otherwise struck. (Document 8 attached to ECF No. 50 at 4). Plaintiff, however, alleged no such thing in his complaint. Instead, he alleged that he was struck once with Corley's keys without mention of

the central questions presented in this matter – *who* struck
Plaintiff, *how* they struck Plaintiff, or *what* specific force was
used, all of which must be answered in order to establish that
excessive force was used in this case.  Dr. Yasgur cannot
testify as to these questions, and thus cannot provide fact
testimony regarding the allegation that Corley attacked
Plaintiff after the scuffle in this matter.  Likewise, although
Plaintiff's medical records clearly indicate that Plaintiff
suffered considerable injuries, those records, which are
presumably the factual basis for Dr. Yasgur's proposed
testimony, cannot answer these questions.

Plaintiff finally relies on two other sources to support
his claim – either hearsay statements made by Plaintiff to
others – specifically the statement in Ortiz's report that
Plaintiff claims he was the victim of an "assault" by Corley,
but presumably also similar statements made to his mother and
doctors, and the refusal of Officer Corley to participate in
this matter or be deposed.  While Officer Corley's recalcitrance
is reprehensible, it does not follow that Corley's silence can

---

being held immobile or otherwise prevented from recoiling, fell,
and then hit his head on a gate and the ground.  (ECF No. 1 at
3-4).  Plaintiff thus never alleged that he was held immobile
while being struck by Corley, so Dr. Yasgur's suggestion of
consistency with the complaint is at least somewhat suspect to
the extent Yasgur opines that Plaintiff was held immobile and
struck.

be taken as proof positive of Plaintiff's claims.  Even assuming
that Plaintiff could offer the fact of Corley's refusal to
participate as evidence, that ultimately results in Plaintiff's
proofs being facts tending to show that Plaintiff was in a
scuffle with other prisoners, that Corley ended that scuffle
with a use of pepper spray after at least some inmates refused
to stop, and that afterwards Plaintiff had injuries to his face
which either resulted from the fracas with the other inmates or
otherwise occurred thereafter.  Those proofs still fail to
establish certain necessary portions of Plaintiff's case –
specifically the required proof that *Corley* used force against
Plaintiff, and that the force used was excessive.  Neither the
silence of a non-moving Defendant,[9] an inadmissible complaint,
nor Dr. Yasgur's report sufficiently provide facts in support of
those allegations sufficient to overcome summary judgment.

Plaintiff thus must rely on the hearsay statements in the
record.  Even were those statements admissible, however, they
provide limited support for his position.  In Ortiz's report,
Plaintiff is asserted to have claimed he was assaulted by Corley

---

[9] This Court's reasoning here should not be read to excuse
Corley's actions, nor as any impediment to Plaintiff seeking a
default judgment against Corley in this matter.  This Court's
reasoning only applies to the current motion by the moving
Defendants who have no control or current relationship with
Corley and who in any event attempted to have Corley respond to
the pleadings in this matter.

without further information.  Likewise, in his statement to his doctors, Plaintiff merely said that Plaintiff was assaulted by unspecified persons and thrown into the bars of the jail during that assault.  Plaintiff's statements to his mother while in the hospital are somewhat stronger – he told her that, while walking in a hallway, he was thrown repeatedly into bars by "an officer" resulting in injuries to his face and jaw.  (Document 5 attached to ECF No. 50 at 3-5).  Plaintiff's mother, however, did not know whether any other inmates were involved, who the officer was, or when this event occurred.  (Id.).

Unfortunately for Plaintiff, these hearsay statements have not been provided in an admissible fashion, nor has Plaintiff proffered an admissible form in which they could be presented to a jury.  "Hearsay statements that would be inadmissible at trial may not be considered for purposes of summary judgment." *Smith v. City of Allentown*, 589 F.3d 684, 693 (3d Cir. 2009).  Where a document or statement that itself constitutes hearsay contains further hearsay within it and thus constitutes double hearsay or hearsay within hearsay, the party relying on that statement must "demonstrate that both layers of hearsay would be admissible at trial" for the statement to be considered at summary judgment. *Id.*  As Plaintiff seeks to use his hearsay statements contained in other documents to prove the truth of the matter asserted – i.e., that he was assaulted by Officer Corley – his statements

recorded in other documents or in his mother's testimony would
not be admissible absent an applicable hearsay exception.  Fed.
R. Civ. P. 801, 802.

In his briefing, Petitioner defends only one form of
hearsay presented – by arguing that Sergeant Ortiz's report is a
regularly kept business record that is admissible as such.  See
Fed. R. Civ. P. 803(6).  The statement in that report, however,
that Plaintiff claimed he had been assaulted presents a further
level of hearsay which Plaintiff would have to prove admissible
for this Court to consider that statement at summary judgment or
trial.  *Smith*, 589 F.3d at 693.  Plaintiff, however, has
provided no basis on which this hearsay within hearsay statement
could be considered admissible, and this Court is aware of no
applicable hearsay exception.  Thus, the only hearsay statement
identifying Corley as Plaintiff's attacker may not be considered
evidence sufficient to create a genuine issue of material fact
as it constitutes inadmissible hearsay.

Turning to the remaining hearsay statements, Plaintiff
fairs little better.  Plaintiff does not argue that his
statement to his mother on the phone should be admissible, and
this Court is aware of no hearsay exception which would permit
Plaintiff's claim to his mother that an unspecified guard
attacked him to be admitted at trial.  This Court may therefore
not consider that statement as evidence in deciding this motion.

Id.  Although the statements made to medical doctors regarding
the cause of Plaintiff's injuries may well be admissible to the
extent they are statements made for medical diagnosis, see Fed.
R. Civ. P. 803(4), those statements do not identify Plaintiff's
attacker, be he a guard or one of the other inmates, at least
one of whom the parties agree struck Plaintiff.  Thus this
statement, the only one of the hearsay statements in the record
regarding the attack from Plaintiff which may be admissible at
trial based on the record and arguments presented to this Court,
does not provide evidence which would allow a jury to conclude
that Corley attacked him, and thus is insufficient to permit a
jury to find in Plaintiff's favor as to his excessive force
claim.  As Plaintiff has presented no admissible evidence
sufficient to permit a jury to find in his favor insomuch as he
has presented no admissible evidence showing that Corley
attacked or assaulted Plaintiff, Plaintiff cannot make out his
claims, and Defendants Balicki and Cumberland County are
entitled to summary judgment for that reason.

    Although Plaintiff's failure to provide admissible evidence
which could lead a jury to conclude that Corley attacked him is
a sufficient basis for a grant of judgment in favor of
Defendants Balicki and Cumberland County, the moving Defendants
are also entitled to judgment based upon their second argument –
that Plaintiff has failed to prove that a policy or custom of

the jail they imposed caused the alleged excessive force or that they are liable for the excessive force because it was caused by their failure to properly train Officer Corley.  Because Plaintiff seeks to recover damages from Balicki, the warden of the jail at the time of this incident, as a supervisor of Officer Corley, he may not make out his claim simply through means of vicarious liability.  See Rode v. Dellarciprete, 845 F.2d 1195, 1207-08 (3d Cir. 1988).

Instead, he must show that Balicki had "personal involvement in the alleged wrongs, id., by showing that Balicki put into place a policy, practice, or custom which caused the alleged constitutional violation; by showing that he personally directed the alleged wrong, or through showing that Balicki knew of and acquiesced in Corley's behavior.  Doe v. New Jersey Dep't of Corr., Civil Action No. 14-5284, 2015 WL 3448233, at *9 (D.N.J. May 29, 2015) (quoting Barkes v. First Corr. Med., Inc., 766 F.3d 307, 316-20 (3d Cir. 2014), rev'd on other grounds, 135 S. Ct. 2042 (2015)); see also Tenon v. Dreibelbis, 606 F. App'x 681, 688 (3d Cir. 2015).  Plaintiff does not allege knowledge and acquiescence or personal direction, but instead attempts to attach liability to Balicki and the County through a policy or custom claim.

Like supervisors, a municipality may be held liable for a constitutional violation only where its policies, practices, or

customs "are the 'moving force [behind] the constitutional violation'" at issue.  City of Canton v. Harris, 489 U.S. 378, 389 (1989) (quoting Monell v. Dep't of Soc. Servs., 436 U.S. 658, 694 (1978)); see also Los Angeles Cnty. v. Humphries, 562 U.S. 29, 35-36 (2010).  As with a supervisor in a policy claim, a municipal entity may therefore only be held liable under § 1983 where the entity has enacted a policy, ordinance, regulation, or decision causes the violation at issue, or where that violation was the result of a municipal custom, "even though such a custom has not received formal approval" by the municipality.  Humphries, 562 U.S. at 36 (quoting Monell, 436 U.S. at 694).

Where a supposed custom, rather than a formal policy or ordinance, is the alleged source of the violation, liability will only attach where "the relevant practice is so widespread as to have the force of law."  Board of County Comm'rs of Bryan Cnty. v. Brown, 520 U.S. 397, 403 (1997).  Regardless of whether a policy or custom is the alleged basis for liability, a § 1983 plaintiff seeking to hold a supervisor or municipality liable under such a theory must show that the adoption of the policy or custom was "taken with the requisite degree of culpability and must demonstrate a direct causal link between the municipal [or supervisory] action and the deprivation of federal rights."  Id. at 404.  Where the municipal action taken was facially lawful –

i.e., did not directly cause the alleged violation – the requisite degree of culpability is at least "deliberate indifference" to the known or obvious consequences of the taken action.  Id. at 407.

One specific subspecies of policy or custom claim which is applicable to both supervisory officials and to municipal entities is a failure to train claim.  City of Canton, 489 U.S. at 388-90.  A municipality or supervisory may only be held liable for such a failure to train where that failure "amounts to deliberate indifference to the rights of persons with whom [their employees] come into contact."  Id. at 388.  A negligently administered training regime will not support liability as only a supervisor or municipality's deliberate acts will support § 1983 liability.  Id. at 391.

Deliberate indifference is "a stringent standard of fault, requiring proof that a[n] actor disregarded a known or obvious consequence of his action."  Connick v. Thompson, 563 U.S. 51, 61 (2011).  "That a particular officer may be unsatisfactorily trained will not alone suffice to fasten liability on the [municipality or supervisor], for the officer's shortcomings may have resulted from factors other than a faulty training program."  City of Canton, 489 U.S. at 390-91.  With the exception of those cases where the risk of failing to train officers is patently obvious, a "pattern of similar

constitutional violations by untrained employees is ordinarily
necessary to demonstrate deliberate indifference for purposes of
failure to train." Connick, 563 U.S. at 62, 64.  It is not
sufficient to show that the violation in question could have
been avoided had "an officer had . . . better or more training,"
as even well-trained officers make mistakes.  City of Canton,
489 U.S. at 391.  Instead, a plaintiff must present facts
sufficient for a jury to find that "the deficiency in training
actually caused the . . . officer's" constitutional violation.
Id.

    In this matter, Plaintiff does not take issue with the
written policies or procedures of the jail, but instead seeks to
hold Balicki and the County liable based on alleged customs –
specifically a custom of not following the required
investigatory procedures and of failing to ensure that jail
employees are properly trained.  In seeking to establish both
the custom of not following investigatory policies and the
alleged failure to train, however, Plaintiff points solely to
the record of a single incident and individual – Plaintiff's
alleged assault by Corley and Corley's own training file.  The
only other evidence Plaintiff identifies to support his failure
to train claim are the fact that Captain Palau was to some
extent overworked during the period between 2010 and 2017 where
he oversaw multiple units including training staff and the

Special Investigation Unit, the handful of other excessive force disciplinary incidents – of which only one occurred between 2010 and the August 2014 incident in this case, the fact that the prison had multiple other uses of force during the time period. Nothing in the record, however, confirms or otherwise suggests that any of these other incidents of force use were in any way invalid or wrongful under the jail's use of force policies. Likewise, although Captain Palau did acknowledge during his deposition (see Document 3 attached to ECF No. 53 at 299) that he may have been stretched thin with all of the responsibilities he previously held when the command of the investigations unit was reassigned to another officer in 2017, nothing in his testimony indicates that he felt that officers were not being adequately trained.

Instead, his testimony was that each officer, in addition to their initial training, received use of force training at least twice a year. Although Officer Corley's record included only two specific records clearly indicative of additional use of force training after his hiring, including one occurring approximately a year before the incident in this matter, the testimony of Captain Palau was that those records were not kept in individual officer's records and that each officer received additional use of force training twice a year.

Plaintiff is thus attempting to rely solely on Corley's own failings or the possibility that Corley missed some of his required training to make out a custom of failing to train jail staff. Given the lack of any evidence suggesting that there was an obvious lack of training,[10] Plaintiff has failed to present evidence which would permit a jury to conclude that the jail's training regimen was so deficient that the failure to correct deficiency could be said to be the result of at least deliberate indifference on the part of Balicki or the County. See City of Canton, 489 U.S. at 390-91; Connick, 563 U.S. at 62. That Corley himself may have been ill trained does not make out Plaintiff's case, and Plaintiff has failed to provide other evidence sufficient to create a general issue of material fact on that issue.

Plaintiff's claims against Balicki and Cumberland County based on an alleged custom of improperly investigating excessive force incidents suffers from a similar problem. Although the report at issue in this case and the testimony of the various jail personnel in regard to that investigation do indicate that

_____

[10] To the extent Plaintiff argues an "uptick" in use of force in 2014, that argument is based on the misunderstanding of the use of force index discussed in the Court's factual recitation above. That different years were grouped differently does not itself indicate that there were more use of force incidents in 2014 than other years, and the parties have not submitted sufficient evidence one way or another as to how many incidents actually occurred in any given year.

there were issues with the investigation of Plaintiff's
allegations of assault by Corley – specifically, it appears from
the evidence and testimony that Ortiz either did not finish his
report or have it properly reviewed, and that Ortiz did not
fully interview all involved prisoners and staff including
Plaintiff himself, that investigation concerns only a single
incident.  That a policy was not followed in a single instance
does not a custom make, and certainly does not establish that
there was a custom of avoiding following the jail's
investigation protocols which operated with the force of law in
the jail or County.  Connick, 563 U.S. at 621; Brown, 520 U.S.
at 403; City of Canton, 489 U.S. at 390-91.

Beyond the paucity of evidence as to the alleged flaws in
the jail's training and investigatory regimens, Plaintiff has
also failed to offer any evidence or testimony, expert or
otherwise, which addresses the causal connections between either
the alleged training deficiencies or the alleged "custom" of
failing to follow proper investigatory procedures and the
alleged assault by Officer Corley.  Without some testimony or
other evidence which would causally connect the alleged customs
or policy failings and the assault in this case, Plaintiff's
claim cannot succeed.  Brown, 520 U.S. at 403-04.  The alleged
deficiencies, which suffer from the problems discussed above,
simply do not speak for themselves.  Without some evidence or

expert testimony causally connecting them to the alleged assault, which itself suffers from the serious evidentiary problems discussed above, Plaintiff simply cannot make out his claims against the moving Defendants.  Id.  Plaintiff has thus failed to present admissible evidence sufficient to create a genuine issue of material fact as to the deficiency of the training or investigatory policies or as to the causal link between those alleged deficiencies and the alleged assault, and Defendants Balicki and Cumberland County are for those reasons entitled to summary judgment as well.

IV.  **CONCLUSION**

For the reasons set forth above, this Court will grant Defendants' motion (ECF No. 50) and will enter judgment in favor of Defendants Balicki and Cumberland County.  An appropriate order follows.

 s/ Noel L. Hillman
Hon. Noel L. Hillman,
United States District Judge

Date: August 28, 2019
At Camden, New Jersey